

**Signed: October 06, 2008**

_____
**LESLIE TCHAIKOVSKY**
**U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                          No. 08-41296 T
                                               Chapter 11
QUAIL LAKE ESTATES ASSOCIATES,
L.P., etc.,

          Debtor-in-Possession.
_____/

### MEMORANDUM OF DECISION DENYING CONFIRMATION

A contested evidentiary hearing on confirmation of the above-captioned debtor's First Amended Plan of Reorganization of June 16, 2008 (Amended July 21, 2008) (the "Plan") was conducted on September 15 and 29, 2008 pursuant to the objection of BankFirst, a secured creditor.  At the conclusion of the hearing, the Court took the matter under submission.  Having fully considered the issues presented, the Court now concludes that confirmation must be denied.  The reasons for the Court's decision are set forth below.

### SUMMARY OF FACTS AND PROCEDURAL HISTORY

Quail Lake Associates, L.P. (the "Debtor") filed a voluntary petition seeking relief under chapter 11 on March 19, 2008.  The Debtor is a limited partnership which was formed in April 2006 for

the purpose of acquiring and developing into residential lots over 700 acres of real property located in Nevada County (the "Real Property"). The sole general partner of the Debtor is Claremont Properties LLC of which Thomas C. Dashiell ("Dashiell") is the sole member and manager. There are two limited partners, Christopher Clark and Nevada Partners Club LLC ("Nevada Partners"), of which John Ham ("Ham") is the general partner.

The Real Property was purchased in April 2006 for approximately $15 million. BankFirst provided the Debtor with a loan for approximately $10.4 million dollars of the purchase price and holds a first priority deed of trust on the Real Property. The balance of the purchase price was advanced by Investors Mortgage Corporation ("IMC"), an affiliate of Nevada Partners. IMC holds a second priority deed of trust on the Real Property.

The Debtor intends to develop the Real Property into 93 lots, 91 of the lots to be sold to third parties and 2 of the lots--Lots 7 and 80--to be reconveyed to the sellers pursuant to the terms of the purchase agreement (the "Vendor Purchase Agreement"). The Vendor Purchase Agreement provides that, if the Debtor fails to convey the lots to the sellers, it is obligated to pay the seller $2 million.

In December 2006 a tentative subdivision map was approved by Nevada County, subdividing the property into three legal parcels. Since then, due to lack of funds, no work of any substance has been

2

done.  The deadline for obtaining approval of a final subdivision map, creating the 93 lots, is September 12, 2010.[1]

The original term of the BankFirst loan was one year.  The Debtor obtained a consensual six month extension of that term by paying three months of interest.  BankFirst advanced the other three months of interest.  When the additional six month term expired without payment or a refinance, BankFirst commenced foreclosure proceedings.  The bankruptcy case was filed shortly before the scheduled foreclosure sale.

The Real Property, less the two lots to be reconveyed to the sellers, has been valued at $20,090,000 in its present state.  The Debtor estimates the value of the two lots to be at least an additional $2 million.  BankFirst's security interest attaches to the Real Property in its entirety and is not affected by the sellers' rights.[2]  Thus, its collateral is worth approximately $22 million.  The balance of BankFirst's debt at this time is approximately $12 million.  The only secured claims senior to BankFirst are the 2007-2008 property tax claims totaling approximately $350,000.  The junior secured debt held by IMC totals in excess of $8 million.  There is

---

[1]At his deposition, Dashiell testified that the deadline for obtaining final map approval was September 2009.  However, at the confirmation hearing, it was established to the Court's satisfaction that California legislation had extended this deadline to September 2010.

[2]The characterization in the Plan and elsewhere of the sellers' rights to reconveyance of Lots 7 and 80 as a vendor's lien is inaccurate.

3

approximately $1 million of unsecured debt, of which Dashiell is owed approximately $650,000.

Two weeks after the Debtor filed its bankruptcy petition, BankFirst filed a motion for relief from the automatic stay. Because this case is a single asset case, 11 U.S.C. § 362(d)(3) requires the Debtor, within 90 days of the petition date, to begin making interest payments on BankFirst's secured claim or to file a plan and disclosure statement that has a reasonable chance of being confirmed within a reasonable period of time. At the conclusion of the hearing on BankFirst's motion for relief from stay, because the Debtor clearly had no ability to make interest payments, the Court conditioned continuation of the automatic stay on the Debtor's satisfying the latter criteria. The Plan was filed by the 90 day deadline, on June 17, 2008.

Shortly after the Plan was filed, BankFirst filed a request for a status conference. It contended that it was entitled to immediate relief because the Debtor's plan (the "Plan") was not confirmable. A telephone conference was scheduled for July 1, 2008. On June 30, 2008, the Court issued a Memorandum in Preparation for Telephone Conference (the "June 30 Memorandum"). In the June 30 Memorandum, among other things, the Court expressed the view that the Plan was legally deficient in that it did not promise unconditionally any payment to general, unsecured creditors and provided that holders of equity interests would retain their interests. See 11 U.S.C. § 1126(g).

4

The Court suggested that it might be wise to deal with the legal issues before proceeding to an evidentiary hearing. The Debtor and BankFirst declined to follow this suggestion and chose to proceed to an evidentiary confirmation hearing. Thereafter, the Debtor made some revisions to the Plan and Disclosure Statement, the Court conditionally approved the Disclosure Statement, and an evidentiary hearing was scheduled for September 15, 2008.

The Debtor solicited votes from all impaired classes, including the class of general, unsecured creditors. The only objection or negative vote was received from BankFirst. The confirmation hearing began on September 15, 2008 and was continued and concluded on September 29, 2008.

### SUMMARY OF THE PLAN

The Plan designates four classes of secured claims, three classes of unsecured claims, and two classes of equity interests. The three classes of secured claims are Classes A-1, the BankFirst secured claim, Class A-2, the IMC secured claim, A-3, the sellers' right to reconveyance of Lots 7 and 80[3], and A-4, the Nevada County property tax claim. The classes of unsecured claims are Classes B, the classified priority claims, C, general, unsecured claims, and D, the insider unsecured claim of Dashiell or his limited liability company. The classes of interests are Classes E-1, the limited partner interests, and E-2, the general partner interests. All of

---

[3]Dashiell testified at the confirmation hearing that this was not actually a secured claim and that foreclosure by BankFirst would take precedence over this claim.

5

the classes are designated as impaired except Class B, the class of nontax priority claims, which the Plan proposes to pay in full in cash on the effective date.

The Plan proposes to treat the unclassified administrative and priority tax claims as required by the Bankruptcy Code. With respect to Classes A-1 and A-2, the secured claims of BankFirst and IMC, it proposes that the secured claimants will retain their liens on the Real Property and that their claims will be paid in full when a QLE Property Sale or Recapitalization occurs.[4] The Plan provides that this must occur within two years from the effective date or they will be entitled to foreclose their security interests. In the mean time, the holders of these claims will receive no payment. Interest will accrue on their claims at the nondefault rate unless, prior to confirmation, the Court determines that another rate is required. During this period of up to two years, the secured creditors will be entitled to seek relief from the foreclosure bar for cause, including lack of adequate protection.

The Plan provides that the Class A-4 Nevada County property tax claim will be treated in the same manner as Classes A-1 and A-2 except that the interest rate will be as provided in 11 U.S.C. § 511. In addition, to the extent that any portion of this claim would, if unsecured, constitute a priority tax claim, the holder of the claim

---

[4]The QLE Property Sale or Recapitalization is defined in section B-3 of the Plan as: (1) the sale of all or part of the Real Property, (2) a refinancing of the Real Property, (3) the re-capitalization of the Debtor by new partner contributions, new borrowing, merger, entry into a joint venture, or by any other means, or (4) a combination of the foregoing.

6

will receive deferred cash payments as required by the Bankruptcy Code.

Class A-3 is characterized as a secured claim.[5]  In fact, this claim represents the Debtor's unsecured obligation to reconvey Lots 7 and 80 to the sellers.  The Plan provides that the sellers will "retain" their lien, that the Debtor will comply with its obligation if legally able to do so, but that any monetary liability will be discharged without payment.  More precisely, the Plan proposes to give the sellers, in place of their unsecured claim, a junior lien securing the Debtor's obligation to reconvey the lots (if legally able to do so) while eliminating any monetary obligation for its failure to do so.

The Plan proposes to pay Class C, the class of noninsider general, unsecured claims, only to the extent there are sufficient funds after QLE Property Sale or Recapitalization to do so after paying all secured debt, priority debt, all actual or projected expenses of the QLE Sale or Recapitalization, plus, if the Debtor is being liquidated or dissolved, a reserve for the anticipated expenses of the liquidation or dissolution.  The Class D insider unsecured claims will be paid only if there are funds remaining after Class C claims are paid in full.  The Debtor will receive a discharge from liability for these claims even if no payment is made.  Finally, the Plan provides that the Class E-1 and E-2 interests will be

---

[5]At the confirmation hearing, Dashiell testified that the sellers did not hold a security interest to secure this obligation. Thus, the designation of Class A-3 as the Vendor Lien Claim is a misnomer.

7

extinguished except that if sufficient funds are received from a Sale or Recapitalization, these interests will be "revived."

The Plan provides further that, after confirmation, the Debtor will be managed by Dashiell subject to direction by a Board consisting of Dashiell, Ham (the principal of IMC and a limited partner of the Debtor), and Alan Vail ("Vail"). Vail is a pre-petition creditor who has performed engineering services for the Debtor on the project and intends to continue to do so after confirmation. The Debtor will continue to operate after confirmation as a Reorganized Debtor. However, most of its actions will be subject to the same notice and hearing requirements as if it were a debtor-in-possession.[6] In addition, the bankruptcy estate will remain in existence and the Debtor's property will be protected in the same fashion (i.e., by the automatic stay) as if it were property of the estate.

Once a QLE Property Sale or Recapitalization has occurred, the Plan will be deemed to be substantially consummated,[7] and all remaining property of the estate will revest in the Debtor. However, both before and after this occurs, the Debtor will be entitled to prosecute, abandon, settle, or otherwise dispose of any of the

---

[6]An exception to this provision is that the Debtor will be entitled to employ and pay professionals post-confirmation without Court approval.

[7]The second sentence of the first paragraph of the Substantial Consummation section is unintelligible. In the event the Plan is amended to correct the legal deficiencies noted by the Court, this sentence should be eliminated or substantially revised.

8

Reorganized Debtor's claim, including claims created by the Bankruptcy Code.

## DISCUSSION

**A. LEGAL DEFICIENCIES NOTED BY COURT**

As the Court pointed out in the June 30 Memorandum, the Plan cannot be confirmed because it makes no unconditional promise of any payment to the Class C general, unsecured creditors. Although the Class C creditors uniformly voted in favor of the Plan, they were not entitled to vote. Section 1126(g) of the Bankruptcy Code provides that, if a plan does not provide for any payment to unsecured creditors, the class of claims is deemed to have rejected the plan. When a class of unsecured creditors rejects the plan, the plan can only be confirmed pursuant to 11 U.S.C. 1129(b) upon a finding that the plan does not discriminate unfairly and is fair and equitable. The Plan is not fair and equitable as to the Class C creditors.

To paraphrase, 11 U.S.C. § 1129(b)(2)(B) of the Bankruptcy Code provides that, with respect to a class of general unsecured creditors, a plan is not fair and equitable unless it provides either for payment in full of the class of unsecured claims or that no subordinate claim or interest will "receive" or "retain" anything under the Plan on account of their pre-existing claim or interest. The Plan attempts to circumvent this requirement by providing that the interests represented by Classes E-1 and E-2 will be extinguished. However, this language is just window dressing. The Plan also provides that the interests will be "revived" if there is

9

sufficient cash to pay off creditors. An interest that is truly extinguished cannot be "revived."

The Plan also provides that the Debtor will continue to operate after confirmation as the Reorganized Debtor. This provision is essential for the Debtor to receive a discharge. See 11 U.S.C. § 1141(d)(3). However, absent the appointment of a trustee, an entity cannot continue to operate without any interest holders as there will be no one authorized to make the ultimate decisions affecting the Debtor's future operations. The Plan provides that Dashiell will continue to manage the Debtor after confirmation and that Dashiell and Ham will serve on the Board. Thus, two of the three interest holders will continue to control the Debtor after confirmation.

There are further provisions that are legally untenable. The Plan provides that the bankruptcy estate will continue to exist after confirmation and that the Debtor's property will all be property of the estate, including subsequently acquired property. The Plan does not specify who will be in charge of this property. The Bankruptcy Code provides that authority over property of a bankruptcy estate is held either by a trustee or a debtor-in-possession. However, no trustee has been appointed, and the Debtor will have changed into a Reorganized Debtor. The Court does not believe that the Debtor can act both in the capacity of a Reorganized Debtor and a debtor-in-possession.

## B. BANKFIRST'S OBJECTIONS

BankFirst contends that the Plan is simply a "hold and wait" plan. It contends that the Plan was not filed in good faith and is

10

not fair and equitable as to BankFirst, particularly given the intended short term nature of BankFirst's loan. It notes that the Plan gives the Debtor an additional two years to do what it has not been able to do in the past year and a half: i.e., raise sufficient money to complete the work necessary to enable it to record a final subdivision map. In the meantime, the Plan proposes that no payments will be made to anyone. It does not even provide for any benchmarks that must be met during the two year period. Moreover, there is no evidence that the Plan is feasible.

BankFirst also notes that the Plan is a "negative amortization" plan as to BankFirst. It contends that the Plan does not satisfy the stringent requirements for a "negative amortization" plan. See Great Western Bank v. Sierra Woods Group, 953 F.2d 1174, 1177-78 (9th Cir. 1992)(holding that whether a "negative amortization" plan is fair and equitable must be determined on a case-by-case basis). In Great Western, the Ninth Circuit noted that courts considering negative amortization plans have considered accrual or payment of a market rate of interest to be a necessary, but not sufficient, requirement for confirmation. Id. at 1177.

In addition, the Ninth Circuit cited with approval a list of factors to be considered in determining whether a negative amortization plan should be confirmed. In addition to accrual or payment of a market rate of interest, those factors include whether the amount and length of the proposed deferral is reasonable, the ratio of the debt to value, whether the plan is feasible, the nature of the collateral--i.e., whether its value is appreciating,

11

depreciating, or stable, whether the risks are unduly shifted to the secured creditor, and whether there are adequate safeguards to protect the secured creditor against plan failure.

BankFirst also objects to the provision in the Plan eliminating its right to default interest and its right to payment of costs and attorneys' fees. See In re Entz-White Lumber & Supply, Inc., 850 F.2d 1338 (9th Cir. 1988).[8] In Entz-White, the Ninth Circuit held that a debtor need not pay interest at the default rate when the claim was being paid in full at confirmation. 850 F.2d at 1339-43. However, the Plan does not propose to pay BankFirst's claim at confirmation.

In response to these objections, the Debtor contends that the Plan does meet the requirements for a negative amortization plan. BankFirst has a substantial equity cushion. It argues that the Plan provides adequate safeguards for BankFirst by providing for post-confirmation Court oversight and authorizing BankFirst to seek relief from the post-confirmation bar on foreclosure for two years. Moreover, it contends that the evidence presented at the confirmation hearing was adequate to establish that the Plan is feasible.

At the confirmation hearing, the Debtor presented evidence of three alternative plans for paying off BankFirst. One of the plans

---

[8]More recently, in General Electric Capital Corp. v. Future Media Productions, Inc., 536 F.3d 969, 973-74 (9th Cir. 2008)(as amended), the Court declined to extend this principle to secured claims paid through sale of the collateral property outside the plan. It remanded the case to the bankruptcy court to consider the viability of the rule adopted by other Circuits, requiring payment at default interest rate unless unenforceable under nonbankruptcy law.

12

was to list the Real Property for sale. A proposed sale broker testified at trial. A second plan was that IMC would advance $1.5 million, which it would obtain from its investors and which would be secured by its second priority deed of trust. Finally, evidence was presented that the Debtor and an entity known as Pacific First had entered into an agreement for the sale of the Real Property subject to Court approval. The purchase price had a cash element that would permit BankFirst to be paid in full. The sale was required to close at the outside by December 15, 2008.

The Court concludes that most, if not all, of BankFirst's objections have merit. The Plan does not satisfy the Entz-White requirements for elimination of pre-existing default interest. As to interest to accrue in the future, there is no evidence of the market rate of interest. Clearly, the Plan must provide for payment of attorneys' fees and other costs.

In addition, considering all the relevant factors applicable to a negative amortization plan, the Court finds that the Plan, as presently drafted, is not fair and equitable as to BankFirst. Although BankFirst has a substantial equity cushion at present, in two years, if final map approval has not been obtained, the value of the Real Property has fallen, and its debt has increased through the accrual of interest, it may be under water. While two years does not sound like a long time, it represents the entire period during which final map approval may be obtained. This unduly shifts the risk of plan failure to BankFirst.

13

Just as important, the Debtor's evidence of feasibility is simply inadequate. The definition of the QLE Property Sale and Recapitalization is so broad as to be virtually meaningless. The Debtor cannot, by presenting multiple plans for dealing with the Real Property, disguise the lack of evidence of feasibility as to any one of these plans. As noted above, one of the plans is to sell the Real Property through a sales broker. Yet, the Debtor has not yet applied for approval of the sales broker's employment. Another plan is to obtain a $1.5 million loan from IMC. Yet, IMC began soliciting advances from its investors only shortly before the confirmation hearing and had obtained only a fraction of the amount needed by the time of the hearing. Similarly, the proposed sale to Pacific First depended on Pacific First's ability to obtain the $13 million in funding to cash out BankFirst's debt. Yet, Pacific First had not yet placed itself in a position to begin soliciting these funds. The Court concludes that this evidence is simply inadequate to establish feasibility.

### CONCLUSION

Confirmation of the Plan will be denied. The structure of the Plan is legally deficient in several respects. As presently drafted, it does not satisfy the requirements for a negative amortization plan. It must provide for payment of pre-petition default interest and provide for payment of market rate of interest under the Plan. Moreover, evidence must be presented as to the market rate of interest. Finally, adequate evidence of feasibility must be

14

presented: e.g., commitments of sufficient funding to either IMC or Pacific Corp.

Clearly, Dashiell, the other equity holders, and IMC have substantial money and time invested in this project. They appear to be competent, knowledgeable developers who are simply suffering from the difficult economic times. They have a strong economic incentive to complete the project. The Court would like to see the Plan amended to cure the legal deficiencies and to be presented with sufficient evidence of feasibility to allow the Court to confirm the Plan. However, in view of the time frame established by 11 U.S.C. § 362(d)(3), the Court cannot give the Debtor more than 30 days to file an amended plan to cure the legal problems. If the Debtor does so and represents to the Court that it now can present sufficient evidence of feasibility, the Court will reconvene the confirmation hearing to allow that evidence to be presented. Otherwise, the Court will be compelled to grant BankFirst relief from the automatic stay.

END OF DOCUMENT

COURT SERVICE LIST

James D. Wood
Law Offices of James D. Wood
3675 Mt. Diablo Blvd. #250
Lafayette, CA 94549-3775

David M. Wiseblood
Seyfarth Shaw LLP
560 Mission St., Ste. 3100
San Francisco, CA 94105-2930

16